UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
FANNI GOLDMAN,

                Plaintiff,                              **MEMORANDUM & ORDER**
        - against -                                   15-CV-2572 (PKC) (LB)

BROOKLYN CENTER FOR
PSYCHOTHERAPY, INC.,

                Defendant.
------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Plaintiff Fanni Goldman ("Plaintiff" or "Goldman") brings this matter alleging that Defendant Brooklyn Center for Psychotherapy ("Defendant" or "BCP") discriminated against her and failed to accommodate her needs as a disabled person in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.* and its implementing regulation, 28 C.F.R. Part 36; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et. seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et. seq.* Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth herein, the Court finds that there is a genuine issue of material fact as to whether Defendant discriminated against Plaintiff because of her claimed disability. Accordingly, Defendant's motion for summary judgment is denied, and Plaintiff's cross-motion for partial summary judgment as to liability is also denied.

# BACKGROUND

**I.      Relevant Facts**

Plaintiff Fanni Goldman lives in Sheepshead Bay, Brooklyn. (Def. 56.1, Dkt. 47-2, at ¶ 1.)[1] Plaintiff has some ability to hear, but has difficulty doing so.[2] (Deposition of Fanni Goldman ("Goldman Dep."), Dkt. 50-4, at 20:5-17.) Plaintiff testified in her deposition that her speech consists of "broken sentences" containing "some words and some sentences" and that her ability to communicate through speech depends on the circumstances. (*Id.* at 30:4-13; 33:2-3.) She can "sometimes[,] but not 100 percent", hear and understand speech, and only from people she knows. (*Id.* at 20:5-17.) She cannot hear well enough to understand words or the speech of a stranger. (*Id.*) Plaintiff's Linked-In Account states that she is a teacher's assistant at St. Francis de Sales School for the Deaf. (Def. 56.1, at ¶ 15.)

Plaintiff communicates by email and texting; she can type and uses a computer at work. (*Id.* at ¶ 17-19.) Plaintiff communicates by telephone with hearing persons using the Sorenson Relay Service Call.[3] (*Id.* at ¶ 60.) American Sign Language ("ASL") is Plaintiff's "personal preference" for communication. (*Id.* at ¶ 22.) If communicating through ASL is not possible, she will communicate using whatever means is circumstance-appropriate, including speech, lip-reading, reading, and writing. (*Id.* at ¶ 23.) Plaintiff communicates with her own medical

---

[1] Unless otherwise noted, a standalone citation to Defendant's 56.1 Statement (Dkt. 47-2) denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to Defendant's 56.1 Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

[2] The parties dispute whether Plaintiff is deaf. In Defendant's 56.1 Statement, Defendant states "Plaintiff is not deaf." (Def. 56.1, at ¶ 4.) Plaintiff responds to this statement: "Disputed. Plaintiff is deaf." (Pl. Response to Def. 56.1, at ¶ 4.)

[3] The Sorenson Relay Service Call system involves an interpreter translating the oral conversation into sign language via video. (Goldman Dep., at 65:15-66:3.)

providers, including her dentist, orthodontist (and the orthodontist's secretary), eye doctor, primary care physician, and obstetrician/gynecologist through handwritten notes, lip-reading, and gestures. (*Id.* at ¶ 29.) Plaintiff communicates with her son, who was born in 2007, through a combination of speaking and signing. (*Id.* at ¶ 27.)

BCP is a non-profit entity that provides moderate-cost mental health services to the Brooklyn community. (*Id.* at ¶ 71.) BCP does not provide emergency mental health services or individual therapy for children, but it does offer play therapy to children for children aged five through nine. (*Id.* at ¶¶ 73-74.) BCP staff are trained that mental health services must be provided in a non-discriminatory manner, and they are given policies on non-discrimination. (*Id.* at ¶ 83.) BCP has an intake process, which involves determining whether the individual's mental health needs are appropriate for BCP to handle and whether there is availability with therapists in a particular specialty. (*Id.* at ¶ 93.)

Plaintiff called BCP on November 11, 2014. (*Id.* at ¶ 106.) Plaintiff was seeking behavioral therapy services for her son. (Goldman Dep., at 180:9-16.) At that time, Plaintiff's son was refusing to go to school, and Plaintiff feared that her son would run away from home. (Def. 56.1, at ¶ 108.) A BCP receptionist told Plaintiff that she should speak to Rissi Prescott, the intake coordinator. (*Id.* at ¶¶ 110-114.) Plaintiff instead asked to speak to Raquel Arroyo, BCP's director of clinical services. (*Id.* at ¶ 116.) Plaintiff spoke to Ms. Arroyo for 40-45 minutes on the phone that day and told Ms. Arroyo that her son "needed services right away." (*Id.* at ¶¶ 121-22.) Ms. Arroyo told Plaintiff that BCP did not have child psychologists (*id.* at ¶ 123), and that it did not have any "hours" available to treat Plaintiff's son. (Goldman Dep., at 300:5-20; Deposition of Raquel Arroyo ("Arroyo Dep."), Dkt. 47-15, at 40:18-41:10.) Ms. Arroyo testified at her deposition that, as of November 11, 2014, BCP had a wait list for services for children that were

Plaintiff's son's age. (Arroyo Dep., at 40:18-41:10, 48:23-49:12.) Plaintiff testified that Ms. Arroyo also told her that BCP did not have interpreter services for hearing-impaired individuals in place at that time. (Goldman Dep., at 197:7-18.) Ms. Arroyo's notes of the call similarly indicate that she told Plaintiff "that an important part of treatment requires ongoing involvement of the parent and [that BCP] did not have interpreter services in place at that time." (Arroyo Call Summary, Dkt. 50-4, at 493.) Ms. Arroyo referred Plaintiff to other medical service providers, including Coney Island Hospital and Advocates for the Blind. (*Id.*; Def. 56.1, at ¶ 128.)

Plaintiff called BCP again on December 15, 2014. (*Id.* at ¶ 132.) The December call was conducted through a Sorenson Relay Service Call. (*Id.* at ¶ 141.) Plaintiff videotaped the call. (Def. 56.1, at ¶ 133.) During the December 15 call, Plaintiff initially spoke with Halinda, BCP's receptionist. (*Id.* at ¶ 142.) Plaintiff told Halinda that she was calling to make an appointment for her son and that he needed to see a psychologist "as soon as possible." (*Id.* at ¶ 143.) Plaintiff eventually asked to speak to Ms. Arroyo. (*Id.* at ¶ 145.) When Ms. Arroyo got on the phone, she reminded Plaintiff of their earlier conversation, in which she had told Plaintiff that the facility did not have any available hours for her son. (Tr. of Sorenson Call on 12/15/2014 ("Sorenson Call Tr."), Dkt. 47-28, at 3.) In response to questioning by Plaintiff, Ms. Arroyo again said that the facility did not have interpreter services in place at that time. (*Id.* at 3, 5.) Ms. Arroyo again referred Plaintiff to Coney Island Hospital and offered to call the facility for her. (*Id.* at 3.)

When Plaintiff contacted Ms. Arroyo on December 15, 2014, she had already wanted to file a lawsuit against BCP for discrimination. (Goldman Dep., at 287:17-21.) Plaintiff was so upset after her first conversation with Ms. Arroyo that she decided to order recording equipment to videotape the second conversation. (Def. 56.1, ¶ 134.) Plaintiff did not inform Ms. Arroyo that she was recording the call. (*Id.* at ¶ 138.) Plaintiff did not contact anyone at BCP other than

4

Ms. Arroyo and did not pursue the patient complaint process at BCP. (*Id.* at ¶ 164.) Plaintiff did not contact Ms. Arroyo after December 15, 2014. (*Id.* at ¶ 151.)

On May 29, 2015, BCP entered into a contract with Sign Talk to provide ASL interpreting services to BCP. (*Id.* at ¶ 104.)

## II. Procedural History

Plaintiff filed her complaint in this action on May 5, 2015. (Dkt. 1.) The parties completed discovery on August 3, 2016. Defendant moved for summary judgment on March 8, 2017. (Dkt. 47.) Plaintiff filed a cross-motion for partial summary judgment on the issue of liability on March 9, 2017. (Dkt. 50.) At Plaintiff's request, the Court held oral argument on the parties' cross-motions on March 15, 2018. (Dkt. 53.)

## **STANDARD OF REVIEW**

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013) (quoting *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)); *see also* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 322). Once a defendant has met his initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). In determining whether there are

genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and internal quotation marks omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (internal citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). The Court addresses each of the party's motions in turn.

## DISCUSSION

### I. Legal Standards of the ADA and the Rehabilitation Act

The ADA and the Rehabilitation Act (collectively, the "Acts") "prohibit discrimination against qualified disabled individuals by requiring that they receive reasonable accommodations that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. National Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) (citations and quotation marks omitted). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public accommodation." 42

U.S.C. § 12182(a). The ADA defines discrimination to include the "failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). Services that may be required by the ADA include: "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12103(1)(A). Title III of the ADA *only* allows for injunctive relief, not damages. *Powell*, 364 F.3d at 86.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Section 504 of the Rehabilitation Act, enacted prior to the ADA, is narrower than the ADA in that its provisions apply only to programs receiving federal financial assistance. 29 U.S.C. § 794(a). The Rehabilitation Act allows for the recovery of damages, provided that the plaintiff shows that the statutory violation resulted from "deliberate indifference" to the rights secured by the Rehabilitation Act. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001). Because the standards adopted by [Title III] are, in most cases, "the same as those required under the Rehabilitation Act," the Court considers these claims together. *Powell*, 364 F.3d at 85 (citation omitted).

Title III and Rehabilitation Act claims include claims based on intentional discrimination, *i.e.*, disparate treatment, disparate impact, and the failure to make a reasonable accommodation.

*Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). To establish a *prima facie* case under either statute for failure to make a reasonable accommodation, a plaintiff must demonstrate: "(1) that [plaintiff] is a qualified individual with a disability; (2) that the [defendant is] subject to one of the Acts; and (3) that [plaintiff] was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his or her disability." *Powell*, 364 F.3d at 85. In light of the broad statutory definition of discrimination, defendants have a presumptive obligation to provide "reasonable accommodations" to individuals with disabilities. Consequently, a covered entity's failure to provide such accommodations will be sufficient to satisfy the third element. *See* 42 U.S.C. § 12182(b)(2)(a)(ii); *Powell*, 364 F.3d at 85. The question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis. *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999).

## II. Defendant's Motion for Summary Judgment

### A. Plaintiff's Disability under the Acts

Plaintiff's discrimination claim is based on a reasonable accommodation theory. Plaintiff claims that she is deaf. (Pl. Response to Def. 56.1, Dkt. 51-1, at ¶ 4.) BCP claims she is not. (Def. 56.1, at ¶ 4.) Defendant does not dispute that Plaintiff suffers from an "impairment," but argues that "Plaintiff is not deaf; she testified, 'I don't hear very well' and that she has some ability to hear." (Def. Mot., Dkt. 47-1, at 9.) For purposes of this case, the definition of "disability" is taken from the ADA, which defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102.

Plaintiff testified—and Defendant does not dispute—that her ability to hear is limited such that she is generally unable to understand words or speech, and is unable to communicate effectively through speech. (Pl. Response to Def. 56.1, at ¶¶ 3-8.) Plaintiff claims that she is

8

substantially limited in the major life activities of hearing and speaking, and therefore is an individual with a disability within the meaning of the ADA. 42 U.S.C. § 12102. Based on this record, as well as the statutory mandate to interpret the definition of "disability" broadly, and construing the record in the light most favorable to Plaintiff, the Court finds that she is disabled for purposes of her claims under the Acts.

Plaintiff further alleges that because she is a disabled individual who was seeking services for her minor son, she qualifies as a "companion" within the meaning of the ADA implementing regulations. 28 C.F.R. § 36.303(c)(1)(i) ("For purposes of this section, 'companion' means a family member, friend, or associate of an individual seeking access to, or participating in, the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation, who, along with such individual, is an appropriate person with whom the public accommodation should communicate."). The Court agrees that, based on the undisputed facts, Plaintiff was a "companion" within the meaning of the ADA regulations. *Id.*

**B.** **Defendant's Status as a "Public Accommodation" under the Acts**

BCP is a psychiatric clinic that provides moderately priced medical services to the public in Brooklyn. (Def. 56.1, at ¶ 71; Pl.'s 56.1, Dkt. 50-2, at ¶ 4.) BCP is, therefore, a public accommodation within the meaning of the Acts. 42 U.S.C. § 12181(7)(F). BCP also does not dispute that it receives federal funds (*see* Def. Response to Pl.'s 56.1, at ¶ 6), and is, therefore, subject to the Rehabilitation Act, 29 U.S.C. § 794(b).

**C.** **Defendant's Alleged Discrimination under the Acts**

Plaintiff alleges that BCP denied psychiatric services to her son because of her deafness. (Pl. Mot., at 12.) Plaintiff claims that Ms. Arroyo, who is the Director of Clinical Services at BCP, informed Plaintiff that BCP would not provide a sign language interpreter for Plaintiff and that she should look elsewhere for mental health services for her son. (*Id.*) Plaintiff argues that BCP's

9

"preemptive"[4] refusal to provide services based on Plaintiff's disability constitutes a *prima facie* case of discrimination under the Acts. BCP counters that the only reason it denied services to Plaintiff's son was because Plaintiff said that her son needed the services immediately and BCP did not have any openings at that time in its behavioral therapy classes. (Def. Mot., at 5; Def. 56.1, at ¶ 122.) Despite not having any openings, BCP alleges that Ms. Arroyo tried to arrange for alternate accommodations for Plaintiff's son at facilities with openings.

The Court must determine whether there is sufficient evidence for a jury to find that Plaintiff was "denied the opportunity to participate in or benefit from [Defendant's] services, programs, or activities, or was otherwise discriminated against by [Defendant], *by reason of . . . her disability.*" *Powell*, 364 F.3d at 85 (emphasis added). This Circuit uses a "substantial cause" analysis to determine whether discrimination occurred under the Acts. In *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003), the Second Circuit held that a plaintiff "suing under the ADA or Rehabilitation Act may show that he or she has been excluded from or denied the benefits of a public entity's services or programs by reason of such disability even if there are other contributory causes for the exclusion or denial, as long as . . . the disability was a *substantial cause* of the exclusion or denial." *Id*. at 291 (emphasis added); *accord Meekins v. City of New York*, 524 F. Supp. 2d 402, 407 (S.D.N.Y. 2007) ("The Second Circuit has held that, because the ADA is remedial legislation and because remedial legislation should be construed broadly to effectuate its purposes, the causation standard under the ADA requires only that the disability be a substantial cause of the exclusion or denial at issue.") (internal quotation marks omitted).

---

[4] By "preemptive", Plaintiff means that BCP's statements were not made in response to any request for accommodation made by Plaintiff and therefore indicate a refusal to provide services to her because of her disability (or an assumption about her disability). (Pl. Mot., at 12.)

The parties dispute whether Plaintiff's disability was a "substantial cause" in BCP's denial of mental health services to Plaintiff's son. The Court notes that the entire interaction between Plaintiff and BCP occurred over the course of two telephone conversations, one on November 14, 2014 and the other on December 15, 2014. The Court considers each of these conversations in turn.

  i.  **The November 11, 2014 Call**

On November 11, 2014, Plaintiff called BCP, asking to speak directly with the Director of Clinical Services, Ms. Arroyo. (Def. 56.1, ¶ 116.) While the parties present differing accounts of the call, it is undisputed that Plaintiff advised Ms. Arroyo that her son needed immediate mental health services and that Plaintiff requested a child psychologist for her son. (*Id.* at ¶¶ 122, 143.) Plaintiff testified that Ms. Arroyo "preemptively" informed her that Defendant *would not* provide Plaintiff interpreter services and referred her to other hospitals in Brooklyn. (Goldman Dep., at 199:8-200:2) ("I asked to make an appointment and she said, no, we don't provide sign language interpreters, you might want to contact these other two places."). Plaintiff testified that when she asked Ms. Arroyo about interpretive services, Ms. Arroyo "jumped to conclusions right away" about Plaintiff's disability needs and denied her service. (*Id.* at 201:11-202:21.)

BCP's version of the events is that, during the November 11 call, Ms. Arroyo first explained to Plaintiff that BCP did not have any child psychologists on staff or any available therapy hours for Plaintiff's son, and that it was only in response to questions from Plaintiff about sign language interpreters that Ms. Arroyo then told Plaintiff that BCP could not provide that service at that time. (Def. 56.1, at ¶ 124.) Ms. Arroyo testified in her deposition that BCP "wouldn't have [had] any problems putting in an interpreter but that—but at first I'd have to be able to offer her the services for the child and that would have still be the same situation in December. I wasn't able to provide mental health services for the child. The interpreter services

11

we would have put in place if that's what she needed." (Arroyo Dep. at 75:9-75:17.) Ms. Arroyo also testified that she was concerned about delivering immediate mental health services to Plaintiff's son and knew that her program would not be able to help him, and that she recommended Coney Island Hospital as a possible resource that might have an opening and interpreter services. (*Id.* at 43:13-44:6, 50:2-50:6.)

Ms. Arroyo's notes from the November 11 call, however, suggest that BCP's lack of interpreter services may have played a role in BCP's denial of mental health services to Plaintiff's son:

> Ms[.] Goldman was informed that the Center did not have available child therapy hours at that time. *Additionally, we did not have interpreter services in place. It was explained to Ms. Goldman that an important part of treatment requires ongoing involvement of the parent and we did not have interpreter services in place at that time.* Ms[.] Goldman was provided with two resources: the Coney Island Hospital and the Advocates for the Blind as a resource where she could possibly obtain further information helpful to her.

(Arroyo Call Summary, Dkt. 50-4, at 493 (emphasis added).)

The Court finds that there remains a factual dispute as to whether Plaintiff's disability was a substantial cause of BCP's denial of mental health services to Plaintiff's son on November 11, 2014. On the one hand, a reasonable juror could find that BCP had no slots available for the requested mental services at the time of November 11 call[5] and that this lack of capacity was the sole or entire reason that BCP denied the services to Plaintiff's son. On the other hand, based on evidence such as Ms. Arroyo's notes of the November 11 call indicating that BCP did not have interpreter services in place and that Ms. Arroyo informed Ms. Goldman that interpreter services

---

[5] The Court notes that at the March 15, 2018 oral argument, defense counsel clarified that the only evidence regarding the unavailability of clinical hours is the testimony of Ms. Arroyo and Ms. Kerri Kopelowitz, Associate Director of BCP, and that there is no physical wait list or appointment schedule that establishes this fact.

were needed for her to participate in her son's treatment (*id.*), a reasonable juror could find that the lack of interpreter services was a substantial cause of BCP's denial of services, and that even if BCP had had the capacity to treat Plaintiff's child, it would have been unwilling to provide the necessary interpreter services for Plaintiff. Thus, whether Defendant's denial of services to Plaintiff's son on November 11, 2014 constituted discrimination under the Acts is a question of fact for the jury.

  **ii. The December 15, 2014 Call**

On December 15, 2014, Plaintiff called BCP a second time. Plaintiff again conveyed a sense of urgency, telling BCP's receptionist that her son needed to see a psychologist "as soon as possible" and that she "needed services right away." (Sorenson Call Tr., at 2.) Plaintiff then asked to speak to Ms. Arroyo, and the receptionist transferred the call. (*Id.*) The transcript of the December 15 conversation between Plaintiff and Ms. Arroyo reads, in relevant part:

> [Plaintiff]: I think/thought we talked a while ago. Maybe last month. We talked about that, you, umm well, refused to schedule an appointment for my son. I think I am talking to the right person?
>
> Interpreter[6]: Nodding to indicate yes, this is Royo [sic], I think we did talk about that. We did not have any hours available. So gave you names of places that have, that are close to you, and you can call them, that try. That's what we talked about? You remember?
>
> [Plaintiff]: Yes I think so, and also do you remember, also, you told me that, you refuse to provide me sign language interpreter. So. Why (you refuse to provide)
>
> Interpreter overlaps: We did not refuse, we just said we do not have that service available. That is not refusing. That's not what we meant, just that we do not have that service available here.
>
> [Plaintiff]: Ok, but I thought that your place is required to provide any service, any kind of service for deaf and hard of hearing, or other disabilities. But the first time

---

  [6] "Interpreter" refers to Arroyo's part of the conversation, as translated by the Sorenson Relay Service Call sign language interpreter.

13

we talked, you seemed like you were refusing to provide interpreters among other things. You never explained why.

Interpreter: Yeah, we do not have that service in place, and so, that's why I gave you that names of different places that will have that provide that interpreter, give that service that you need that right away. So, that is why I gave you the names of different hospitals, that will provide that service, and were you able to get in touch with them and get that service?

[Plaintiff]: No, have not contacted, I did try, but, seems not available either. So?

Interpreter: So umm, Coney Island, near there, or other clinics in the area, give me which places that you have tried, and I can try to call others and see if there are other names available.

(*Id.*) The call continues:

[Plaintiff]: If you don't mind my asking, I don't understand why your center does not provide sign language interpreters. What if another deaf or hard of hearing person called your center and wanted to set up an appointment for their child or themselves, what will you do?

Interpreter: Well, we would be in the same situation, we cannot provide that service, and we have to try to offer other options, other places that have services that may have that interpreter available.

[Plaintiff]: Ok. I think what you just said is not right. You are supposed to provide interpreters, regardless. Required by law. You have to have something available, there, just like the hopsitals [sic], they will have interpreters there ready, just like you, especially your center, and you don't have any. That's just not right. I just wanted to let you know of that.

Interpreter: I understand, but, I can't tell you that I have it if I don't have it. And I did give you the name of that hospital that have interpreters[.]

(*Id.* at 5.) The transcript of the December 15 call is supplemented by Ms. Arroyo's call summary note for that date, which reads: "In December, Ms[.] Goldman called to ask again if services were available and was again informed we did not have services available." (Arroyo Call Summary, at 493.)

Plaintiff argues that the transcript of the December call shows that she was turned away because of her disability. Plaintiff states that "it is quite difficult to believe" that the "only reason Plaintiff was turned away was because of a lack of clinical hours." (Pl. Reply, Dkt. 52, at 6.) Plaintiff further explains that BCP keeps a wait list for prospective patients when no hours are available, but BCP did not offer the wait list to Plaintiff. (Pl. 56.1 Response, at ¶¶ 76, 125.) Plaintiff alleges that BCP's refusal to offer any wait list accommodation shows that Plaintiff's disability was a substantial reason for the denial of services. (Pl. Reply, at 6-7.)

BCP argues that Ms. Arroyo clearly reiterated at the beginning of the December conversation that BCP did not have any available mental health services. BCP argues that the issue of interpreter services was "moot" because BCP did not have the requested mental health services available. (Def. Mot., at 22.) BCP explains that Ms. Arroyo was focused on "how to get mental health services for Plaintiff's son," while Plaintiff was focused on whether she "would be provided with an ASL interpreter." (*Id.* at 14.) Lastly, BCP argues that Ms. Arroyo's statement that an interpreter service was not "in place" at the time of the December 15 call does not mean that interpreter services would never be provided. (*Id.* at 16.)

As with the November call, the Court finds that questions of material fact exist as to whether Plaintiff's disability was a "substantial cause" of BCP's denial of therapy services to Plaintiff's son on December 14, 2014. The parties began their second call by discussing BCP's lack of capacity to provide mental health services to Plaintiff's son. At the outset, Plaintiff reminded Ms. Arroyo that she had "refused to schedule an appointment for [her] son." (Sorenson Call Tr., at 3.) Ms. Arroyo responded: "I think we did talk about that. We did not have any hours available. So gave you names of places that have, that are close to you, and you can call them,

15

that try." (*Id.*) This exchange suggests that the primary reason BCP denied Plaintiff's son the requested services was because there were no time slots, not because of Plaintiff's disability.

Ms. Arroyo also explained that she did not "refuse" Plaintiff interpreter services, but rather that the facility did not have them in place at the time of the call. In itself, the fact that BCP could not have provided interpreter services at that moment does not violate the Acts. Hospitals are not required to provide interpreter services for every possible patient or interested party. 42 U.S.C. § 12182(b)(2)(A)(iii) (public accommodations must "take such steps *as may be necessary* to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services") (emphasis added).[7] Thus, a reasonable juror could find that if BCP could not provide the requested mental health services to Plaintiff's son in December 2014, the fact that BCP also could not provide a sign language interpreter for Plaintiff did not violate the Acts, because there was no need for an interpreter.

Yet, Ms. Arroyo's reference in the December 14 call to BCP's inability to provide interpreter services in connection with the denial of mental health services lends support to Plaintiff's claim that BCP's unwillingness to obtain interpreter services for Plaintiff was a substantial cause for its denial of services to Plaintiff's son. It also suggests that Ms. Arroyo's

---

[7] Title III also does not require a defendant-hospital to provide a plaintiff "with her ideal or preferred accommodation; rather, the ADA requires that a defendant provide a plaintiff with an accommodation that is 'reasonable' and permits the plaintiff to participate equally in the good, service, or benefit offered." *Andersen v. North Shore Long Island Jewish Healthcare*, 12-CV-1049, 2013 WL 784391, at *10 (E.D.N.Y. Jan. 23, 2013), *adopted by* 2013 WL 784344 (E.D.N.Y. Mar. 1, 2013); *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11–CV–2456, 2013 WL 1211496 at *7, n.10 (E.D.N.Y. Mar. 25, 2013) (rejecting objection to report and recommendation that defendants' denial of plaintiff's request for therapy was a refusal to accommodate his disability because defendants were not obligated under the Acts to provide plaintiff with his preferred treatment).

claim that the requested mental health services were unavailable was a pretext. In the call, Plaintiff asked what Defendant would do "if another deaf or hard of hearing person called your center and wanted to set up an appointment." (Sorenson Call Tr., at 5.) Ms. Arroyo responded that BCP would be "in the same situation, we cannot provide that service, and we have to try other options." (*Id.*) While Ms. Arroyo's use of the term "service" is ambiguous—*i.e.*, Plaintiff argues that it refers to interpreter services while Defendant argues that it refers to mental health services—a jury could reasonably interpret Ms. Arroyo's statement to mean that the hospital would not be willing to accommodate deaf people under *any* circumstances. If this were true, it would be a clear violation of the Acts. Because no reasonable inference can be made based on the cold transcript, even in combination with other evidence adduced by Defendant[8], this question of fact is best resolved by a jury. *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003) ("It is axiomatic that courts should not assess credibility on summary judgment.").

Similarly, Ms. Arroyo's call summary for the second phone call—in which she states, "[i]n December, Ms[.] Goldman called to ask again if services were available and was again informed we did not have services available" (Arroyo Call Summary, at 493)—is susceptible to different interpretations of what Ms. Arroyo meant by "services." It is equally plausible that she was referring to interpreter services, behavioral therapy services, or both. If the first option, Ms. Arroyo's statement could be construed as an admission that BCP denied Plaintiff's son services because of a lack of interpreter services, a potential violation of the Acts. If the second option, Defendant would be presenting a legitimate and non-discriminatory reason for denying Plaintiff

---

[8] As Defendant highlighted at the March 15, 2018 oral argument, Ms. Arroyo testified in her deposition about the meaning of her statements during the November and December calls, and Defendant has also put forth evidence regarding BCP's mission as a moderate-cost health care provider that serves specifically serves people with mental disabilities, its non-discrimination policies and training, and its past accommodation of hearing-impaired clients and individuals.

17

services, *i.e.*, there were no available hours. If both, Defendant could be viewed as admitting that the lack of interpreter services was one reason it denied Plaintiff access, but the question of whether it was a "substantial cause" would remain open.

In sum, the Court finds that there is sufficient evidence upon which a reasonable juror could find that Plaintiff's disability was a "substantial cause" of BCP's denial of mental health services to Plaintiff's son. *See Henrietta D.*, 331 F.3d at 279 (holding that District Court did not err in concluding that "plaintiffs' disabilities were a substantial cause of their inability to obtain services, or that the inability was not so remotely or insignificantly related to their disabilities as not to be 'by reason' of them"); *see also Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (noting that "an extra measure of caution is merited in affirming summary judgment in a discrimination action" because direct evidence of discrimination is rare and "often must be inferred from circumstantial evidence found in affidavits and depositions"). Accordingly, the Court denies Defendant's motion for summary judgment.[9]

### D. Plaintiff's State Law Claims

The New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") likewise prohibit disability discrimination. N.Y. Exec. L. § 296(2); N.Y.C. Admin. Code § 8-107. The NYSHRL is construed coextensively with Title III and Section 504. *See Williams v. City of New York*, 121 F. Supp. 3d 354, 364, n. 10 (S.D.N.Y. 2015). However, "claims under the [NYCHRL] must be reviewed independently from and more liberally than their

---

[9] In reaching this conclusion, the Court acknowledges that, based on the March 15, 2018 oral argument and the overall record, Defendant will likely make a compelling case at trial for a finding of non-liability and that Defendant may, indeed, prove that this is a case exemplifying the proverb that, "no good deed goes unpunished." However, because the Court cannot rule out the possibility that Plaintiff can prevail in this matter and because of the importance of the principle at stake, it declines to grant summary judgment to Defendant.

18

federal and state counterparts." *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotations omitted). "Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law[; however,] [with] similarly worded provisions of federal and state civil rights laws [being viewed] as a floor below which the City's Human Rights law cannot fall." *Id*.

Plaintiff alleges that Defendant violated the NYCHRL and NYSHRL. Because the scope of the disability discrimination provisions of the NYCHRL and NYSHRL are similar to those of the Acts, and for the same reasons discussed above, Plaintiff's claims under the NYCHRL and NYSHRL survive summary judgment. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (citations omitted); *see also Rodal v. Anesthesia Grp. of Onondaga*, 369 F.3d 113, 117, n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims."); *Romanello v. Shiseido Cosmetics Am.*, 00-CV-7201, 2002 WL 31190169, at *7 (S.D.N.Y. Sept. 30, 2002) ("[T]he same standards used to evaluate claims under the ADA also apply to cases involving the NYSHRL and NYCHRL.").

## III. Plaintiff's Cross-Motion for Summary Judgment

Plaintiff moves for summary judgment on the issue of liability against Defendant. Because, as discussed above, disputed factual issues remain as to the liability of Defendant, this motion must be denied. The conflicting evidence raises triable issues of fact that preclude summary judgment in favor of either party. A reasonable jury could conclude that Defendant's denial of services to Plaintiff was not substantially caused by Plaintiff's disability, but that determination is a factual question for the jury to resolve.

## **CONCLUSION**

For the reasons stated herein, Defendant's motion for summary judgment is denied, and Plaintiff's cross-motion for summary judgment as to liability is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 19, 2018
       Brooklyn, New York